# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### Richmond Division

RICHARD ALAN HALL,     )
    Plaintiff,            )
                       )
       v.              )     Civil No. 3:16cv745 (REP)
                       )
NANCY A. BERRYHILL,[1]    )
Acting Commissioner of Social Security,   )
    Defendant.           )
_____)

## REPORT AND RECOMMENDATION

On March 4, 2013, Richard Alan Hall ("Plaintiff") applied for Social Security Disability

Benefits ("DIB"), and on March 11, 2013, Plaintiff applied for Supplemental Security Income

("SSI") under the Social Security Act ("Act"), alleging disability from a personality disorder and

anxiety, with an alleged onset date of January 30, 2009. The Social Security Administration

("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an

Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final

decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in finding that Plaintiff failed to meet the requirements of four listed

impairments, in assigning weight to medical opinions in the record, in formulating the residual

functional capacity ("RFC") and in posing insufficient hypotheticals to the vocational expert

---

[1]     On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill should be
substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this matter.

("VE"). (Mem. in Supp. of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 16) at 22-27.)

This matter now comes before the Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter

now ripe for review.[2] For the reasons that follow, the Court recommends that Plaintiff's Motion

for Summary Judgment (ECF No. 15) be DENIED, that Defendant's Motion for Summary

Judgment (ECF No. 17) be GRANTED and that the final decision of the Commissioner be

AFFIRMED.

## I.    PROCEDURAL HISTORY

On March 4, 2013, Plaintiff filed an application for DIB and, on March 11, 2013,

Plaintiff filed an application for SSI with an alleged onset date of January 30, 2009. (R. at 245-

53, 255-57.) The SSA denied these claims initially on January 30, 2014, and again upon

reconsideration on August 11, 2014. (R. at 139-60, 162-79.) At Plaintiff's written request, the

ALJ held a hearing on March 31, 2016, and on Plaintiff's motion, the ALJ amended the alleged

onset date to March 24, 2014.[3] (R. at 38-40, 42-43, 180-82.) On April 14, 2016, the ALJ issued

a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as

disabled under the Act, because he could perform jobs that existed in significant numbers in the

national economy. (R. at 30-31.) On July 6, 2016, the Appeals Council denied Plaintiff's

---

[2]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

[3]    Plaintiff's amended alleged onset date falls after his date last insured for DIB — June 30,
2013 — depriving him of disability insured status on the alleged onset date. (R. at 266.)
Therefore, Plaintiff voluntarily withdrew his DIB application and the ALJ dismissed Plaintiff's
DIB claim. (R. at 22, 42-43.) Only the SSI claim remains at issue.

2

request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-3.)

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the

3

findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. 20 C.F.R. § 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. 20 C.F.R. § 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite his physical and mental limitations. 20 C.F.R. § 416.945(a). At step four, the ALJ assesses whether the claimant can perform his past work given his RFC. 20 C.F.R. § 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. 20 C.F.R. § 416.920(a)(4)(v).

### III.    THE ALJ'S DECISION

On March 31, 2016, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 38-78.) On April 14, 2016, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 19-31.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 24-31.) At step one, the ALJ determined that

Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (R. at 25.) At step two, the ALJ determined that Plaintiff had the following severe impairments: bipolar disorder; borderline personality disorder; depressive disorder; anxiety disorder; and, alcohol use disorder. (R. at 25.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments. (R. at 25-26.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform a full range of work at all exertional levels with additional non-exertional limitations. (R. at 26.) He could perform unskilled (SVP 2) work in a non-production oriented, indoor[4] work setting. He could have no interaction with the public and no more than occasional interaction with coworkers and supervisors. (R. at 26.) At step four, the ALJ found that Plaintiff could not perform his past

---

[4] The ALJ's decision limits Plaintiff to indoor work settings. (R. at 26.) However, the ALJ clearly intended to limit Plaintiff to outdoor work settings. Throughout the record, including in his testimony before the ALJ, Plaintiff indicated a strong preference for the outdoors, explaining that it calms him down. (R. at 56-60, 64-66, 72-73, 1036, 1045, 1094, 1277.) Further, the ALJ twice asked the VE to identify outdoor jobs to the extent that the work comported with someone of Plaintiff's age, educational background, work experience and RFC. (R. at 76.)

Plaintiff does not challenge the other jobs that exist in the national economy that the VE testified that Plaintiff can perform (*i.e.*, landscape laborer and park worker). Instead, Plaintiff briefly notes that he could not perform his past work as a stable attendant, because one of his medications caused his skin to break out in excessive heat or sun. (Pl.'s Mem. at 4 n.3.) Because the ALJ found that Plaintiff could not perform any past relevant work, the Court will ignore the stable attendant position. (R. at 30.) However, the record contains little evidence of Plaintiff's sensitivity to heat or sun exposure. (R. at 292, 486, 591, 855.) Indeed, after May 23, 2014, despite nearly two more years of medical history, the record shows no complaint of heat-induced skin problems. (R. at 855.) Instead, the record stands replete with instances of Plaintiff and his treating sources noting that he preferred the outdoors and spent much of his time there. (R. at 56-60, 64-66, 72-73, 1036, 1045, 1094, 1277.)

The transcript of the hearing before the ALJ, combined with the overwhelming weight of the evidence in the record, makes clear that the ALJ limited Plaintiff to outdoor work. Thus, the Court will treat the RFC accordingly, as limiting him to outdoor work settings.

relevant work as a saw operator. (R. at 30.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 30-31.) Specifically, he could work as a landscape laborer, park worker or stable attendant. (R. at 31.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 31.)

## IV.    ANALYSIS

Plaintiff, forty-nine years old at the time of this Report and Recommendation, previously worked as a saw operator, roofer, deli manager, farm hand and cook. (R. at 255, 271.) He applied for Social Security Benefits, alleging disability from a personality order and anxiety with an alleged onset date of March 24, 2014. (R. at 42-43, 269.) Plaintiff's appeal to this Court alleges that the ALJ erred in finding that Plaintiff did not satisfy the requirements of the listed impairments, in assigning weight to medical opinions in the record, and in formulating an insufficient RFC and posing an insufficient hypothetical to the VE. (Pl.'s Mem. at 23-27.) For the reasons set forth below, the ALJ did not err in her decision.

### A. The ALJ Did Not Err in Finding that Plaintiff Did Not Meet the Requirements of Listings §§ 12.02, 12.04, 12.08 and 12.09.

Plaintiff argues that the ALJ erred by not finding that his impairments met or medically equaled those of Listings §§ 12.02, 12.04, 12.08 and 12.09. (Pl.'s Mem. at 23-24.) Specifically, Plaintiff asserts that his mental impairments and alcoholism should have led the ALJ to render a favorable decision at step three of the sequential analysis. (Pl.'s Mem. at 24.) Defendant responds that the ALJ properly evaluated the criteria in the Listings. (Def.'s Mot. for Summ. J. and Br. in Supp. ("Def.'s Mem.") at 14-17.)

Plaintiff bears the burden of proving that he meets or equals a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The Listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting

6

standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

Plaintiff's condition must satisfy all of a listing's enumerated criteria to qualify him as disabled. *Zebley*, 493 U.S. at 350. Plaintiff claims that he meets the criteria of Listing § 12.02 (for organic mental disorders), § 12.04 (for affective disorders), § 12.08 (for personality disorders), and § 12.09 (for substance addiction disorders). To meet each of these listings, Plaintiff must demonstrate that he has the underlying disorder. 20 C.F.R. Part 404, Subpt. P, App'x 1, §§ 12.02(A), 12.04(A), 12.08(A), 12.09.

Listings §§ 12.02 and 12.04 also require Plaintiff to show that his respective disorder causes:

B. . . . [A]t least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;
[("Paragraph B")]

OR

C. Medically documented history of a chronic [organic mental (12.02)/affective (12.04)] disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medical or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration;
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [him] to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
[("Paragraph C")]

§§ 12.02(B)-(C), 12.04(B)-(C). Listing § 12.08 requires Plaintiff to satisfy the same Paragraph B criteria resulting from his borderline personality disorder. § 12.08(B). Listing § 12.09 contains no independent Paragraph B or C. Instead, Plaintiff can satisfy § 12.09 by demonstrating that he (1) suffers behavioral or physical changes associated with the regular use of substances that affect his central nervous system and (2) satisfies any of the three above-described Listings. § 12.09.

The ALJ found that Plaintiff satisfied neither Paragraph B nor Paragraph C and, thus, did not meet or medically equal one of the listed impairments to establish his disability.[5] (R. at 25-26.) In assessing Paragraph B, the ALJ found that Plaintiff's impairments caused him: (1) no restriction in his activities of daily living; (2) moderate difficulties in social functioning; (3) moderate difficulties in concentration, persistence, or pace; and, (4) no episodes of decompensation. (R. at 25-26.) In assessing Paragraph C, the ALJ again found no episodes of decompensation, no marginal level of adjustment, and no inability to function outside of a highly supportive living arrangement. (R. at 26.) Substantial evidence in the record supports the ALJ's determination that Plaintiff does not meet the requirements of the listings for organic mental, affective, personality or substance addiction disorders.

Plaintiff's admitted activities of daily living support the ALJ's conclusion that his impairments caused him no restrictions in this area. During the hearing, Plaintiff testified that he lived with his girlfriend and cooked homemade meals every other day. (R. at 47, 55.) Around the house, he did the dishes, cut the grass weekly, gardened, and also dressed and showered on

---

[5]      The ALJ did not evaluate Plaintiff under Listing § 12.02. However, as the Court explained, Listing § 12.02 and 12.04 contain identical Paragraphs B and C criteria. Because the ALJ compared Plaintiff's impairments to the requirements of Listing § 12.04, the Court reviews her determination under that listing. Evidence supporting the ALJ's analysis of the Paragraph B or Paragraph C criteria regarding § 12.04 will necessarily mirror the evidence that would support a similar finding under § 12.02.

his own. (R. 55-57.) Plaintiff lost his driver's license after repeated convictions for driving under the influence. (R. at 57.) However, a friend picked up him and his girlfriend twice a month to grocery shop and run other errands. (R. at 57-58, 61.) His brother visited twice per month to pick up the trash but, otherwise, Plaintiff did not spend much time around people other than his girlfriend. (R. at 53, 60.) Plaintiff watched several hours of television each night, though he preferred the outdoors. (R. at 58.) Plaintiff testified that he enjoyed recreational activities, including hunting, fishing and camping. (R. at 59.) He fished twice a month and hunted daily in the Fall. (R. at 59.) On a typical day, he played with his dogs and walked around nearby fields looking for relics. (R. at 64.) From chores to hobbies, Plaintiff's testimony supports the ALJ's conclusion that he had no limitations in his activities of daily living.

On June 28, 2013, Plaintiff completed an adult function report that further supports the ALJ's determination regarding his daily activities. (R. at 290-97.) He reported that he cooked, did laundry, and had no problems with his personal care. (R. at 291-92.) Plaintiff could pay bills, count change and use a checkbook. (R. at 293.) At the time, Plaintiff indicated that he did not spend much time outside, because his skin would break out from the heat. (R. at 292.) However, his testimony before the ALJ in March 2016 made clear that, by then, he spent significant time outside every day. (R. at 56-61, 64-66.) Plaintiff's self-assessed function report, like his testimony, supports the ALJ's assessment that Plaintiff's condition does not limit his activities of daily living.

Plaintiff's testimony and function report similarly comport with the ALJ's determination that he had moderate difficulties in social functioning as well as in concentration, persistence or pace. Plaintiff testified that he does not like people and spending time around others makes him angry and uncomfortable. (R. at 53.) In fact, during his testimony, Plaintiff offered only his

dislike of others to explain why he believed that he could not work. (R. at 52-53.) Similarly, in the function report, he noted "getting along with others" as the only limitation caused by his impairments. (R. at 295.) Plaintiff also indicated that he had no regular social activities and did not go anywhere or do anything, because he became aggravated and impatient around other people. (R. at 294-95.) However, as detailed above, Plaintiff lived with his girlfriend, got rides from a friend to do his shopping, and regularly saw his brother. (R. at 47, 57-58, 60-61.) These self-assessments demonstrate that Plaintiff spent most of his time alone or with his girlfriend and his anger remained at bay when he did not interact with others, consistent with the ALJ's conclusion that he had moderate limitations in social functioning.

Plaintiff also stated that he sometimes finished what he started, and that he followed oral directions fairly well but not written ones. (R. at 295.) He could follow a television show, though sometimes he got distracted. (R. at 58.) He did not handle stress or changes in routine well, but his anxiety medication made him "a little calmer." (R. at 296-97.) Yet, Plaintiff planted, weeded and watered his garden, tending to it every day. (R. at 57.) He cooked meals from scratch every other day, and he could dress a deer as well as filet a fish. (R. at 55, 65.) These regular activities and functions indicate that Plaintiff could perform a variety of tasks, albeit with some distraction, and they support the ALJ's determination that he had moderate limitations in concentration, persistence or pace.

Objective medical evidence and medical opinions in the record also support the ALJ's assessment that he does not satisfy the criteria found in the listings. On November 16, 2013, DDS psychologist Rebecca E. Fromme, Ph.D., evaluated Plaintiff's mental status. (R. at 590-94.) On a typical day, as Plaintiff explained to Dr. Fromme, he made coffee, watched the news, walked his dogs, spent time with his girlfriend, played video games and enjoyed bow hunting.

(R. at 592.) He had no problems with self-care, but avoided going shopping because other people frustrated him. (R. at 592.) At that time, Plaintiff admitted drinking alcohol once or twice per week, consuming about eight drinks per sitting. (R. at 593.) Dr. Fromme noted that Plaintiff appeared alert, oriented and cooperative with a normal mood. (R. at 593.) He had no trouble following conversation, he remained polite and calm with good social skills, and Dr. Fromme easily established a rapport with him. (R. at 593.) Plaintiff's formal testing revealed intact cognitive flexibility and language skills, good planning skills and basic attention, as well as solid verbal abstraction skills. (R. at 593-94.) Cognitively, he could shift between numbers and letters with accuracy, and he showed systematic strategy in a drawing exercise. (R. at 593-94.) Dr. Fromme opined that, more than anything else, Plaintiff's poor frustration tolerance limited his ability to work. (R. at 594.) She found him capable of repetitive tasks of mild to moderate complexity and following verbal instructions. (R. at 594.) Dr. Fromme also noted that Plaintiff's past work involved solitary functioning without public interaction. (R. at 594.)

On May 23, 2014, Plaintiff presented to Hanover Community Services Board ("Hanover CSB") after a hospitalization following his suicide attempt in March. (R. at 855, 885-92.) Counselor Susan Bragg, LPC, performed a mental health intake assessment, noting that Plaintiff described himself as often tired and angry, with an easily triggered temper. (R. at 855.) He consumed alcohol two to three times per week, having eight to twelve drinks each time. (R. at 857.) Plaintiff had intact memory, average intelligence, friendly and cooperative behavior, as well as fair insight. (R. at 858.) However, he appeared disheveled and showed impaired judgment and cognitive distortions. (R. at 858.)

On June 26, 2014, Plaintiff returned to Hanover CSB, where Rochelle Klinger, M.D., performed a psychiatric evaluation. (R. at 861-63.) Dr. Klinger noted that, after arguing with his

girlfriend in March, Plaintiff had swallowed dozens of pills combined with alcohol, but he reported no current suicidal ideation. (R. at 861-62.) Plaintiff complained about stress, anger and anxiety. (R. at 861.) Dr. Klinger found him well-groomed with goal-directed speech, depressed mood and poor historical judgment, but no psychotic symptoms. (R. at 862.) Dr. Klinger also adjusted Plaintiff's medications to address his anxiety. (R. at 863.) Four days later, Plaintiff's girlfriend called Dr. Klinger to report his second suicide attempt. (R. at 866.)

Dr. Klinger treated Plaintiff again on August 6, 2014. (R. at 872-73.) He had maintained sobriety for four to five weeks, and Dr. Klinger encouraged him to continue participating in recovery activities. (R. at 872-73.) Dr. Klinger's notes remained largely unremarkable, recording Plaintiff's logical thought process, alertness, with no psychosis despite his impaired judgment and hopeless thoughts. (R. at 872.) Plaintiff had no current suicidal ideation, and Dr. Klinger opined that a relapse with alcohol could trigger suicidal thoughts. (R. at 873.) Indeed, combining alcohol and prescription pills led to Plaintiff's third and fourth suicide attempts in February and May 2015, respectively. (R. at 1093-94, 1169-74, 1210-13.)

By July 29, 2015, Plaintiff showed improvements in his condition. (R. at 1057-59.) He had not had a drink in six weeks and avoided events with alcohol, though he did not attend AA meetings. (R. at 1057.) Instead, he gardened, cut his grass and watched movies. (R. at 1057.) Dr. Klinger noted that Plaintiff remained cooperative and calm with fair judgment, as well as having normal thought content and speech. (R. at 1057.) Because alcohol increased his suicide risk, Dr. Klinger recommended that Plaintiff contact a recovery coach and participate in a twelve-step program. (R. at 1059.)

These records support the Paragraph B limitations that the ALJ found. First, they indicate that Plaintiff had no restrictions in his activities of daily living. Instead, he avoided

interacting with the public. He spent much of time outside in his yard or with his dogs, as well as cooking and watching television. Second, these records demonstrate Plaintiff's moderate restrictions in social functioning. He avoided shopping and interacting with others, but he communicated and cooperated with his treatment providers. Third, the medical records show that Plaintiff had, at most, moderate difficulties with concentration, persistence or pace. With routine, he completed the tasks that he set out to accomplish, including gardening and cooking. Plaintiff's most frequent complaints related to his anger and frustration, and yet he performed well in tests given by Dr. Fromme. Finally, the medical records and opinion evidence indicate no episodes of decompensation.

As shown through Plaintiff's testimony, his self-assessments, objective medical evidence and medical opinions, substantial evidence in the record supports the ALJ's conclusion that Plaintiff failed to satisfy the Paragraph B criteria in the listings. Because Listing § 12.08 requires a claimant to satisfy Paragraph B to establish disability, the ALJ did not err in finding that Plaintiff failed to meet or equal Listing § 12.08.

The remaining listings cited by Plaintiff, §§ 12.02, 12.04 and by reference 12.09, allow claimants to establish disability through satisfaction of at least one of the Paragraph C criteria: repeated episodes of decompensation; marginal adjustment such that slight mental demands or changes in environment would cause decompensation; or, inability to function outside of a highly supportive living arrangement. §§ 12.02(C), 12.04(C); *see also* § 12.09(A)-(B) (finding the required level of severity for substance addiction disorders met upon satisfaction of the requirements of §§ 12.02 or 12.04). Substantial evidence supports the ALJ's determination that Plaintiff did not meet the Paragraph C criteria.

As discussed above, the record shows no episodes of decompensation. Evidence in the record similarly does not indicate a marginal level of adjustment. Plaintiff planned out meals that he prepared from scratch, contemplated and implemented the layout of his garden, and sought out good locations for tree stands or hunting blinds in the woods. (R. at 55, 64.) Despite catching no deer in two consecutive seasons, Plaintiff enjoyed hunting and continued to do so. (R. at 59.) He had to learn new hunting territory after he moved, and he expressed no frustration about that adjustment. (R. at 59-60.) Indeed, Plaintiff explained that his circumstances got "a whole lot better" after the move, because it kept him away from drugs, alcohol and people who would cause him to use. (R. at 70-71.) Plaintiff's medical records confirm that when he remained sober, his condition improved. (R. at 872-73, 1057.) The record shows no marginal level of adjustment. Similarly, the record demonstrates Plaintiff's independence and confirms that he functioned outside of a highly supportive living arrangement. Specifically, Plaintiff lived with his girlfriend, but prepared homemade meals on his own, spent much of his time outside by himself, and had no problems with self-care or personal hygiene. (R. at 47, 55-57, 291-92.) Thus, the determination of the ALJ that Plaintiff failed to establish the Paragraph C criteria finds support from substantial evidence in the record.

To qualify as disabled at step three, Plaintiff must meet or equal all of the requirements of one of the listed impairments. *Zebley*, 493 U.S. at 350. Because Plaintiff failed to establish either the Paragraph B or Paragraph C criteria, the ALJ properly found that Plaintiff did not meet or medically equal the severity of any of the listed impairments sufficient to establish disability.

### B. Substantial Evidence Supports the ALJ's Evaluation of the Medical Evidence.

Next, Plaintiff argues that the ALJ erred in evaluating the medical evidence and assigning weight to medical opinions in the record. (Pl.'s Mem. at 25-26.) Specifically, Plaintiff argues

that the ALJ should have given greater weight to the opinions of Ms. Bragg and Dr. Klinger. (Pl.'s Mem. at 25-26.) In response, Defendant highlights inconsistencies between Ms. Bragg and Dr. Klinger's opinions and the overall record. (Def.'s Mem. at 17-21.) Defendant argues that the ALJ properly evaluated and weighed the evidence before her. (Def.'s Mem. at 19-21.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. § 416.945(a)(1). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. § 416.945(b). The RFC must incorporate impairments supported by the objective evidence in the record, as well as those impairments that have basis in the claimant's credible complaints. *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. § 416.945(e).

To determine which impairments to incorporate, the ALJ must analyze the claimant's medical records provided by the claimant and any medical evidence from any ordered consultative examinations or medical expert evaluations. 20 C.F.R. §§ 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that comport with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. § 416.920b(a). If, however, the medical opinions conflict internally with each other or other evidence, then the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. § 416.920b(b), 416.927(c)(2)-(6), (e).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical

sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 416.913(a), 416.927(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. § 416.913(d).[6]

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. § 416.927(c)(2); *Lewis v. Berryhill*, 858 F. 3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the ultimate issue of the claimant's disability for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion conflicts with other evidence or when otherwise not well-supported. § 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, courts should leave an ALJ's decision untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record;

---

[6]    The regulations detail that "other sources" include medical sources other than those considered "acceptable medical sources" under 20 C.F.R. § 416.913(a). The given examples comprise a non-exhaustive list.

(4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as defined under the Act. § 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, the ALJ may apply those same factors in evaluating opinion evidence from "other sources." SSR 06-03p.

Here, the ALJ considered the evidence in the record and assigned significant weight to Dr. Fromme's assessment and little weight to the medical source statements provided by Ms. Bragg and Dr. Klinger. (R. at 27-29.) Despite Plaintiff's argument to the contrary, the ALJ explained these decisions, and substantial evidence in the record supports them.

### i. Dr. Fromme's assessment

On November 16, 2013, Dr. Fromme performed a DDS mental status exam of Plaintiff. (R. at 590-94.) Dr. Fromme interviewed Plaintiff, reviewed his records and conducted a cognitive assessment. (R. at 591.) As discussed above, Dr. Fromme found Plaintiff to be calm, polite, oriented and cooperative, with good eye contact, goal-directed speech, euthymic mood and coherent thought processes. (R. at 593.) At that time, Plaintiff consumed about eight drinks per night once or twice each week. (R. at 593.) He demonstrated a low-average to average vocabulary range, good social skills and no impulsivity. (R. at 593.) His testing revealed no cognitive deficits. (R. at 593.) Dr. Fromme assessed Plaintiff as having intact cognitive and language abilities, good planning and basic attention skills, as well as solid verbal abstraction skills and the ability to recall four out of five target words. (R. at 593-94.) Dr. Fromme found Plaintiff's ability to work limited only by his poor frustration tolerance. (R. at 594.) She noted that his past work involved solitary functioning, and that he told her that he was then seeking

employment. (R. at 594.) According to Dr. Fromme, Plaintiff could perform mild to moderately complex repetitive tasks, follow verbal instructions, and independently manage his funds all without additional or special supervision. (R. at 594.)

The ALJ's assignment of significant weight to Dr. Fromme's opinion finds support in other medical evidence in the record. On September 6, 2013, Plaintiff went to Theresa A. Thomas Medical Center ("Thomas Medical Center") for a follow-up on his hypertension. (R. at 562.) He denied chest pain or shortness of breath, but reported that he sometimes gets easily irritated and angered. (R. at 562.) Christine M. Young, M.D., noted Plaintiff's normal mood, affect and behavior. (R. at 562.) Dr. Young gave Plaintiff a psychiatric referral for his anxiety and instructed him to follow up in six months. (R. at 563.) Six months later, Plaintiff returned to Dr. Young on March 6, 2014. (R. at 622.) Plaintiff reported some sharp left chest pain, and Dr. Young recommended ibuprofen. (R. at 623-24.) Other than the chest pain, Dr. Young noted unremarkable findings. (R. at 622-24.) She reported normal neurological and psychiatric symptoms, and she increased Plaintiff's dosage of Celexa. (R. at 623-24.)

On March 27, 2014, Plaintiff returned to Thomas Medical Center, complaining that the Celexa did not work, because he still felt stressed and depressed. (R. at 637.) Five days earlier, he had taken twenty Celexa tablets in an attempted suicide. (R. at 637.) Plaintiff denied any current suicidal or homicidal ideations, and he admitted that his suicidal thoughts arise when he drinks alcohol. (R. at 637.) A nurse noted his high blood pressure, likely caused by cocaine use, for which he tested positive. (R. at 637, 639.) Plaintiff had an otherwise normal physical exam and gave a good history of his mental status. (R. at 638.) The nurse encouraged him to quit drinking, smoking and using illegal drugs. (R. at 639.)

On May 23, 2014, Plaintiff completed his intake assessment with Ms. Bragg at Hanover CSB. (R. at 855-60.) He recounted his suicide attempt and explained his anger and temper. (R. at 855.) Ms. Bragg found Plaintiff friendly, cooperative and oriented with fair insight, though disheveled and with impaired judgment. (R. at 858.) Plaintiff wanted to understand his anger and how to manage it. (R. at 856.) He indicated that he could "do with or without" alcohol and drugs, but Ms. Bragg assessed his abuse as severe. (R. at 858.) Ms. Bragg noted that Plaintiff would likely benefit from case management, supportive counseling, psychiatric services and psychotropic medication. (R. at 860.)

Based on his intake assessment, Plaintiff saw Dr. Klinger on June 26, 2014 for a psychiatric evaluation. (R. at 861.) As discussed above, he reported no current suicidal ideation, instead complaining of stress, anger and anxiety. (R. at 861.) Dr. Klinger found Plaintiff with a depressed mood and poor historical judgment (but no psychotic symptoms), and she adjusted his medications to control his anxiety. (R. at 862-63.) By August 6, 2014, Dr. Klinger noted largely unremarkable findings. (R. at 872-73.) Plaintiff had logical thought process, alertness, with no psychosis despite impaired judgment and hopeless thoughts. (R. at 872-73.) He remained sober and without suicidal thoughts. (R. at 872-73.) These records reinforce that Plaintiff struggles to control his anger, and that alcohol and drug use exacerbate his symptoms.

On June 30, 2014, Plaintiff again attempted suicide by overdosing on prescription drugs after a domestic dispute, and he arrived unresponsive at St. Mary's Hospital. (R. at 1115.) The emergency room discharged him two days later, noting that he minimized his overdose, reported feeling good, and denied any suicidal or homicidal thoughts. (R. at 1130-32.) From there, Plaintiff received five days of in-patient psychiatric treatment. (R. at 1155-67.) Plaintiff blamed his hospitalization on his anger during an argument with this girlfriend, stating that drinking

made him angry. (R. at 1156.) By July 3, Plaintiff had significantly more coherent speech, goal-directed thought and a euthymic mood. (R. at 1157.) When discharged, Plaintiff had acknowledged the effect of alcohol on his mood and participated in group and individual therapy. (R. at 1160.) Throughout August 2014, Plaintiff remained sober and without suicidal thoughts, though he sometimes felt hopeless. (R. at 872, 902.) On December 31, 2014, Plaintiff felt "much better" since he moved to a more rural area. (R. at 1098.)

On February 3, 2015, Plaintiff returned to the emergency room at St. Mary's unresponsive following his third suicide attempt by drug overdose. (R. at 1169-1208.) By February 5, Plaintiff had no suicidal thoughts, and he acknowledged that he only became suicidal when intoxicated. (R. at 1177.) He blamed his stress and frustration on waiting for his disability decision. (R. at 1178.) A mental status exam yielded unremarkable results: cooperative and alert with goal-directed speech and unimpaired cognition. (R. at 1181.) On February 9, Plaintiff reported to Ms. Bragg that getting outside on a four-wheeler helped him process his feelings since his latest hospitalization. (R. at 1094.)

On May 24, 2015, emergency medical services admitted Plaintiff to St. Mary's after his fourth and final suicide attempt reflected in the record. (R. at 1210-62.) Plaintiff presented alerted though intoxicated, and claimed that he swallowed thirty pills and a half bottle of whiskey. (R. at 1210.) Three days later, much like his previous hospitalizations, Plaintiff remained clinically stable, showing no signs of withdrawal. (R. at 1232-33.) St. Mary's discharged him with instructions to stop drinking and smoking, as well as to follow-up with Dr. Klinger at Hanover CSB. (R. at 1256-57.) Heavy alcohol and drug abuse predicated each of Plaintiff's suicide attempts and subsequent hospitalizations. After each discharge, Plaintiff's temperament and condition improved with sobriety and compliance with his medications.

By July 29, 2015, Plaintiff showed continued progress. (R. at 1057-59.) He had not had a drink in six weeks, choosing to work in his yard, watch movies and sleep instead. (R. at 1057.) Dr. Klinger noted normal findings and fair judgment, and she recommended addiction recovery services. (R. at 1057, 1059.) On October 1, 2015, Plaintiff again reported six weeks of sobriety. (R. at 1051.) Dr. Klinger updated his symptoms status to "improved" and noted his stability, making no changes to his medication. (R. at 1051-52.)

By December 2015, Plaintiff presented with baseline symptoms and, despite one slip up, no relapse. (R. at 1040.) He told Dr. Klinger that he enjoyed deer hunting and found that its daily structure helped him maintain a good routine. (R. at 1040.) On March 9, 2016, Dr. Klinger described Plaintiff's symptoms as "[i]n partial remission," noting that he would not let a family member detoxing from heroin stay with him, because he recognized his own risk for relapse. (R. at 1277-79.) Plaintiff debated leaving his girlfriend if she continued to drink and use drugs, but he spent much of his time outside hunting, fishing and gardening. (R. at 1277.) Dr. Klinger found Plaintiff stable overall and improving with his own recovery. (R. at 1279.)

These medical records confirm that Plaintiff did best alone and with the help of medical professionals. His overdoses flowed from stress, anger and arguments with his girlfriend, and his recovery stabilized when he regularly engaged in outdoor activities alone. Further, when he abstained from alcohol and drugs, Plaintiff's treatment records remained normal. These records support Dr. Fromme's assessment of largely normal findings, poor frustration tolerance, and that Plaintiff functioned best in solitary activities. Substantial evidence supports the ALJ's assignment of significant weight to Dr. Fromme's opinion.

### ii.     Ms. Bragg's medical source statement

On October 23, 2014, Ms. Bragg completed a mental capacity assessment. (R. at 1268-71.) She opined that Plaintiff had marked limitations with: punctuality, maintaining a schedule and regular attendance; completing a normal workday or workweek without interruption from psychologically based symptoms; and, accepting instructions and responding appropriately to criticism from supervisors. (R. at 1268-69.) In all other areas of functioning, Ms. Bragg found only moderate, slight or no limitations. (R. at 1268-70.) The ALJ gave Ms. Bragg's assessment little weight due to inconsistencies with the record as a whole and with Plaintiff's admitted activities. Ms. Bragg's assessment does not comport with her own treatment records, other objective medical evidence in the record and Plaintiff's subjective statements.

Ms. Bragg first saw Plaintiff on May 23, 2014, when she completed his intake assessment at Hanover CSB. (R. at 855-60.) Ms. Bragg noted Plaintiff's average intelligence, friendly and cooperative behavior, normal mood and impaired judgment. (R. at 858.) Based on her assessment, Ms. Bragg set Plaintiff up to receive mental health case management, supportive counseling and psychiatric services for psychotropic medication. (R. at 860.)

During Plaintiff's next six appointments with Ms. Bragg, between his intake assessment and the October 2014 mental capacity assessment, Plaintiff reported on his anger and experiencing "ups and downs." (R. at 864, 868, 1104, 1106, 1109, 1112.) Ms. Bragg recorded normal findings, consistently noting that Plaintiff appeared pleasant, cooperative, sober and goal-oriented. (R. at 864, 868, 1106, 1109.) He attended his scheduled appointments and called Ms. Bragg to keep her updated on his circumstances and other appointments. (R. at 1107-08, 1110.) In July 2014, Plaintiff removed all alcohol from his house, and in August, he resisted the urge to drink. (R. at 868, 1109.) These records show that, while Plaintiff struggled with anger

management, he kept regular appointments. They do not indicate, as Ms. Bragg's October 2014 assessment did, that Plaintiff would have marked difficulty completing a full workday or workweek.

Ms. Bragg's records following the October 2014 assessment similarly show that Plaintiff did not suffer from the marked limitations that she opined. For example, in October 2015, Plaintiff presented with a bright affect, explaining that he started hunting at 5:30 that morning. (R. at 1045.) On December 16, 2015, Plaintiff reported going bow hunting every day, in the morning and evening. (R. at 1036.) He found it "easier to do well when he ha[d] a routine." (R. at 1036.) However, he had still not shot a deer all season. (R. at 1038.) When Plaintiff expressed frustration, it often related to his rejected disability application. (R. at 1110, 1178.) These records show Plaintiff's ability to repeatedly maintain a daylong schedule that requires advanced planning and commitment, even when unsuccessful. Ms. Bragg's treatment records support the ALJ's decision to give little weight to her October 2014 assessment.

Other medical evidence in the record, described in detail above, also supports the ALJ's assignment of weight to Ms. Bragg's opinion. Plaintiff often presented with normal mood and behavior, and his medical records reveal unremarkable findings. (R. at 562, 622-24, 872-73, 902, 1057, 1059, 1181, 1277-79.) When he remained sober, Plaintiff better controlled his anger and frustration, staying active by hunting, fishing and gardening. (R. at 1040, 1057, 1277, 1279.) These records suggest that Plaintiff maintained abilities beyond what Ms. Bragg opined in October 2014.

Finally, Plaintiff's own testimony supports the ALJ's decision to give little weight to Ms. Bragg's assessment. Again, Plaintiff testified that he cooked full, homemade meals, did the dishes, cut the grass, walked the dogs, gardened, fished, hunted and camped. (R. at 55-57, 64.)

His average day would begin around 6:30 in the morning and end between 10:00 and 11:00 at night. (R. at 63.) As his medical records confirm, Plaintiff admitted that he did not handle stress well, but getting outside and walking helped control his stress and anger. (R. at 72-73.)

The decision of the ALJ to assign little weight to Ms. Bragg's assessment finds support in the record. Ms. Bragg's own treatment notes, other medical evidence in the record, and Plaintiff's subjective statements indicate that he could keep a schedule, complete tasks and communicate with others to a greater extent than Ms. Bragg found. Moreover, the ALJ accounted for Plaintiff's low stress tolerance by limiting him to no interaction with the public and no more than occasional interaction with coworkers and supervisors. (R. at 26.) Consequently, substantial evidence in the record supports the RFC and the ALJ's decision to afford Ms. Bragg's opinion little weight.

### iii.    Dr. Klinger's mental capacity assessment

Plaintiff also asserts that Dr. Klinger's opinion warranted greater weight from the ALJ. (Pl.'s Mem. at 25-26.) On January 21, 2016, Dr. Klinger completed a mental capacity assessment of Plaintiff's limitations resulting from psychological factors. (R. at 1263-66.) Dr. Klinger opined that Plaintiff had extreme limitations in nearly every area of functioning, including: remembering work procedures and detailed instructions; maintaining concentration for extended periods; performing on a schedule; sustaining a routine without special supervision; completing a normal workday or workweek without interruption; interacting with the public, coworkers and supervisors; behaving appropriately; and, adapting to changes in a work setting. (R. at 1263-66.) In four areas, Dr. Klinger assessed Plaintiff's limitations as marked: understanding and remembering short, simple instructions; carrying out those instructions; making simple work-related decisions; and, asking simple questions or requesting assistance.

(R. at 1263-65.)  Dr. Klinger concluded that Plaintiff's mood swings, depression and irritability would interfere with his concentration and cause him to miss more than four days of work per month.  (R. at 1265.)

The ALJ gave little weight to Dr. Klinger's opinion due to its inconsistencies with the overall record and Plaintiff's admitted activities of daily living.  (R. at 29.)  In fact, Dr. Klinger's opinion reflects an even more restrictive version of Ms. Bragg's assessment.  (*Compare* R. at 1263-66 (Dr. Klinger finding seventeen areas of extreme limitation; four areas of marked limitation; one unknown; and, that Plaintiff would miss more than four days of work per month) *with* R. at 1268-70 (Ms. Bragg finding no areas of extreme limitation; four areas of marked limitation; six areas of slight limitation; six areas of no limitation; and, expressing no opinion about Plaintiff's monthly absences from work).)  Thus, as with Ms. Bragg's opinion, substantial evidence in the record supports the ALJ's assignment of weight to Dr. Klinger's opinion.

First, Dr. Klinger's opinion does not comport with her treatment records.  She first treated Plaintiff on June 26, 2014, three months after his first overdose.  (R. at 861-63.)  Dr. Klinger noted Plaintiff's depressed mood and historically poor judgment but no psychotic symptoms or suicidal ideations.  (R. at 862.)  Her findings remained unchanged in August 2014, after his second suicide attempt, except that Plaintiff had maintained four weeks of sobriety.  (R. at 872-73.)  By December 31, 2014, Plaintiff reported improved sleep and feeling much better since he moved to a more rural area.  (R. at 1098.)  Dr. Klinger updated his status to "[i]n partial remission."  (R. at 1098.)

Dr. Klinger's treatment records from 2015 and 2016 continue to reflect stabilized symptoms and, at times, improvement.  (R. at 1040-41, 1051-52, 1057-59, 1277.)  On July 29, 2015, Plaintiff presented calm and six weeks sober, despite not attending AA meetings.  (R. at

1057.) Still sober on October 1, 2015, Dr. Klinger found his symptoms improved and his mood good as he anticipated the start of bow hunting season. (R. at 1051.) On December 16, 2015, at Plaintiff's last appointment before Dr. Klinger's mental capacity assessment, Dr. Klinger found him cooperative and doing better with his mood and recovery. (R. at 1040-41.) The daily structure of bow hunting, which he enjoyed, allowed him to maintain a "good routine." (R. at 1040.) During her final appointment with Plaintiff on March 9, 2016, Dr. Klinger described him as "stable overall," in partial remission and doing better with his recovery, despite a relapse with alcohol the month prior. (R. at 1277, 1279.) He spent much of his time outside bow hunting, fishing and gardening. (R. at 1277.) Dr. Klinger's treatment notes reflect Plaintiff's struggle with anger, depression and alcohol abuse, but they also depict improvements to his condition and limitations far less severe than those reflected in her January 2016 opinion.

As discussed in comparison to Ms. Bragg's opinion, other objective medical evidence in the record also supports the ALJ's assignment of little weight to Dr. Klinger's opinion. Plaintiff consistently appeared pleasant, cooperative, goal-oriented and sober. (R. at 562, 622-24, 864, 868, 902, 1045, 1106, 1109, 1181.) Certainly, he struggled with anger and depression — attempting suicide four times — but he reported doing better as time passed and spent much of his time engaged in outdoor activities that he enjoyed. (R. at 637, 866, 1051-52, 1057, 1169, 1210.) Plaintiff's admitted daily activities — including walking his dogs, cooking full meals, gardening, hunting and fishing — likewise bolster the ALJ's determination that he maintained greater functioning capacity than Dr. Klinger opined. Consequently, the ALJ did not err in assigning little weight to Dr. Klinger's opinion.

**C. The ALJ Did Not Err in Formulating the RFC or in Posing Hypothetical Questions to the VE.**

Finally, Plaintiff challenges the RFC and, by extension, the hypothetical questions based on the RFC that the ALJ posed to the VE. (Pl.'s Mem. at 26-27.) Plaintiff argues generally that the ALJ "picked and chose" details from the record to support the RFC and "ignored everything else." (Pl.'s Mem. at 27.) In the same vein as his previous arguments, Plaintiff points to the opinions of Dr. Klinger and Ms. Bragg as evidence that the ALJ should have incorporated into the RFC and the hypothetical. (Pl.'s Mem. at 27.) In response, Defendant argues that the RFC and corresponding hypothetical question find support in the record. (Def.'s Mem. at 21-22.)

Again, the ALJ must determine the claimant's RFC before evaluating whether he can perform his past relevant work. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis in the claimant's credible complaints. § 416.945(e). The ALJ must conduct a function-by-function analysis in assessing a claimant's RFC, and courts remand as appropriate in cases where the ALJ fails to assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. Once the ALJ formulates and explains the RFC, at step four, the ALJ assesses whether the claimant can perform his past work given his RFC. 20 C.F.R. § 416.920(a)(4)(iv), 416.965. If the claimant cannot perform any past relevant work, the ALJ proceeds to the final step. 20 C.F.R. § 416.920(a)(4)(v).

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant could perform other work existing in significant numbers in the national economy. 20 C.F.R. § 416.920(g), 416.966. The Commissioner can carry her burden in the final step with the testimony of a VE. § 416.966(e).

During an administrative hearing, the ALJ must pose hypothetical questions to the VE that accurately represent the claimant's RFC, so that the VE can offer testimony about any jobs existing in the national economy that the claimant could perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Walker*, 889 F.2d at 50.

Here, the ALJ found that Plaintiff could perform a full range of work at all exertional levels with certain non-exertional limitations. (R. at 26.) He could perform unskilled (SVP 2) work in a non-production oriented, outdoor work setting. He could have no interaction with the public and no more than occasional interaction with coworkers and supervisors. (R. at 26.) The ALJ performed an exhaustive review of the record to formulate the RFC and explained her determination. (R. at 26-30.) During the hearing, the ALJ incorporated all of the limitations of the RFC into the third hypothetical posed to the VE. (R. at 75-76.) Given these limitations, the VE testified that an individual with the same age, education and work experience as Plaintiff could perform work that exists in the national economy. (R. at 75-77.) Specifically, the VE stated that such an individual could work as a landscape laborer or a park worker. (R. at 76-77.) Substantial evidence in the record supports the RFC and the corresponding hypothetical.

The RFC finds support from substantial objective medical evidence in the record. As discussed at length above, Plaintiff's medical history reveals unremarkable findings mixed with extended periods of sobriety and stability as well as intermittent periods of severe substance abuse, anger and depression leading to four suicide attempts. (R. at 590-94, 637-38, 855, 857-58, 861-63, 872-73, 902, 1094, 1098, 1057-59, 1115, 1130-32, 1155-67, 1169, 1177, 1210, 1232-33, 1277-79.) Overall, Plaintiff maintained a poor ability to manage stress and frustration, but he

consistently stabilized when he remained sober and kept to a routine of various outside activities. (R. at 868, 1036, 1040, 1045, 1057, 1109, 1279.) For example, on December 16, 2015, Plaintiff reported feeling angry at times but not acting on his emotion. (R. at 1036.) He went hunting every day and, despite not catching a single deer, Plaintiff enjoyed the routine. (R. at 1036, 1038, 1040.) Ms. Bragg and Dr. Klinger found his mood and recovery progress improved. (R. at 1038, 1041.) In March 2016, Plaintiff relapsed with alcohol when his girlfriend began drinking again. (R. at 1277.) However, he returned to sobriety by getting outside often to hunt, fish and work in his garden. (R. at 1277.) Dr. Klinger noted his overall stability and improved recovery. (R. at 1279.) These records demonstrate Plaintiff's ability to perform a variety of tasks, despite his difficulties coping with stress and anger, so long as he remained outside and on his own. The ALJ formulated an RFC that provides for precisely these limitations that the record supports.

Dr. Fromme's opinion, previously described in full, further supports the RFC assessment. She found Plaintiff's vocabulary range low-average to average, his planning and basic attention skills good, and his language and cognition abilities intact. (R. at 593-94.) Dr. Fromme found "poor frustration tolerance" Plaintiff's most limiting symptom. (R. at 594.) This opinion supports the ALJ's decision to preclude Plaintiff from any work-related interaction with the public and allow for no more than occasional interaction with coworkers and supervisors. Indeed, the ALJ went further than the restrictions suggested by Dr. Fromme and limited Plaintiff to unskilled work. (R. at 26, 28.)

Finally, Plaintiff's own statements support the RFC. Plaintiff testified that he could read, write and perform simple math problems. (R. at 47.) He regularly cooked from scratch, washed the dishes, cut the lawn, gardened and watched television. (R. at 55-58.) He preferred the

outdoors, especially hunting, fishing, gardening, exploring on foot and watching the sunset. (R. at 58-60, 64-66.) He did not drive, because he lost his license after repeated DUI offenses. (R. at 57.) He did not trust people and avoided spending time around others. (R. at 53, 62.) He did not attend AA meetings, and he reported last drinking four weeks before his hearing with the ALJ. (R. at 54.) He still had "bad days" every three to four months where he sought to isolate himself. (R. at 67-68.) Even then, he tried to walk in the woods to calm himself down and keep from using. (R. at 69.) By his own account, Plaintiff typically kept a full day of activity, and had improved since moving to the country away from the influence of other people and alcohol. (R. at 63-66, 70-71.)

Considering the record as a whole, substantial evidence supports the RFC determination by the ALJ. The objective medical evidence, Dr. Fromme's medical opinion and Plaintiff's own testimony show that Plaintiff could perform at all exertional levels with the non-exertional limitations included by the ALJ. Because the hypothetical question posed to the VE incorporated all of Plaintiff's substantiated limitations, the same evidence in the record also supports the ALJ's hypothetical. Aside from pointing to the two opinions to which the ALJ gave little weight, Plaintiff does not cite specific evidence in the record that the ALJ allegedly ignored. Nor does Plaintiff attack the sufficiency of specific limitations within the RFC. Having extensively reviewed the record, the Court finds that substantial evidence supports the RFC and the related hypothetical. Therefore, the ALJ did not err in formulating either one.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 15) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 17) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  August 2, 2017